**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Bobby Joe YEAGIN,
Defendant–Appellant.**

No. 90–8113.

United States Court of Appeals,
Fifth Circuit.

Feb. 22, 1991.

Rehearing Denied March 14, 1991.

David F. Bragg (Court-appointed), Bragg, Chumlea, McQuality, Smithers & Curry, Austin, Tex., for defendant-appellant.

Philip Police, LeRoy Morgan Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GOLDBERG, KING, and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge.

Bobby Joe Yeagin appeals his convictions for possession of methamphetamine with intent to distribute, use of a firearm in connection with a drug trafficking offense, and possession of a firearm as a convicted felon. Yeagin contends that the district court erred by admitting evidence of Yeagin's nine prior felony convictions. Because we conclude that the prejudicial effect of this evidence greatly outweighed its slight probative value on any relevant issue, we reverse and remand the case to the district court for a new trial.

A United States marshal with an arrest warrant for a parole violation sought to arrest Yeagin at his apartment. Yeagin's girlfriend came to the door and told the marshal that Yeagin was staying in room 638 of the Marriott Hotel. She also described Yeagin's car. Finally, she falsely accused Yeagin of participating in a recent murder.

Several police officers met the marshal at the hotel. In the parking lot, the marshal located the car described by Yeagin's girlfriend. The marshal instructed a deputy to watch the car while he went into the hotel.

The chief of security at the hotel informed the marshal that no one named Yeagin was registered there. When the marshal asked the chief to check the registration card for room 638, the chief reported that Danny Allen's name was on the card. The marshal described Yeagin, and the chief reported that he had seen a man

matching that description entering room 638.

Meanwhile, the deputy in the parking lot notified the marshal that a man and a woman were approaching the car identified as Yeagin's. The marshal and several other officers went to the parking lot to question the couple; they determined that the man was, in fact, Danny Allen. After a brief conversation, the officers allowed Allen to leave. Then they proceeded to room 638.

When the shirtless Yeagin opened the door, the marshal pulled him into the hallway and arrested him. The marshal had no search warrant for room 638. However, since the officers saw another man in the room, they made a protective sweep of the room and restrained another convicted drug offender who was inside.

Yeagin was taken to another room of the hotel for a post-arrest interview. He remained there, handcuffed and shirtless, for about two hours. During this time, one of the officers wrote a statement granting consent for officers to search room 638. Since Yeagin did not have his glasses with him, an officer read the statement aloud. Yeagin then signed the statement.

Yeagin consented to let the officers search the room and his luggage. He told the officers that they would probably find drugs and firearms in the room. The officers found several firearms, methamphetamine, a small amount of marijuana, and drug paraphernalia including scales, spoons, and syringes. They also found a leather jacket with a firearm and methamphetamine inside and a shoulder bag containing letters addressed to Yeagin.

At trial the hotel's chief of security testified that a room in Danny Allen's name had been paid for in cash two days before the arrest. He also testified that he had seen Yeagin at the hotel changing rooms the day before the arrest, that he had noticed the barrel of a gun showing through a tear in a bag that Yeagin was carrying, and that he had helped Yeagin to move his parcels into room 638.

Finally, the security chief testified that after Yeagin was jailed awaiting trial, he

and his girlfriend had phoned the Marriott to request the return of Yeagin's personal property seized during the search of room 638. Yeagin's girlfriend told the chief that Yeagin was especially interested in recovering his leather jacket and boots. She eventually picked up the property, which consisted mainly of luggage and clothes.

At the security chief's request, Yeagin's girlfriend provided a statement—allegedly written and signed by Yeagin—that authorized her to retrieve these items. At this time, officers had custody of all firearms, illegal drugs, and drug paraphernalia seized in the search.

Before trial, Yeagin moved to suppress the evidence obtained in the search on the grounds that he did not voluntarily consent to the search. The district court denied this motion.

Near the end of the government's case, the prosecutor sought to introduce evidence of Yeagin's nine prior felony convictions. In an effort to prevent the introduction of this evidence, Yeagin offered to make two stipulations: (1) he would stipulate that he had the requisite intent to distribute if the government proved possession of drugs, and (2) he would stipulate that he had prior felony convictions if the government proved possession of a firearm. The government refused to accept these stipulations, and the trial judge allowed the government to read to the jury a list of all nine of Yeagin's prior felony convictions.[1]

### Admissibility of the Search Evidence

 Yeagin first argues that both searches—the initial security sweep and the later consent search—violated his fourth amendment rights and that evidence obtained in these searches should be suppressed. The only search of consequence to this appeal, however, is the second search because the government seized no evidence during the first search.

Since the district court entered no factual findings and indicated no legal theory underlying its decision to admit the evidence

obtained in the consent search, we must independently review the record to determine whether any reasonable view of the evidence supports admissibility. *See United States v. Horton,* 488 F.2d 374, 380 (5th Cir.1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). The government must prove that the consent was voluntary only by a preponderance of the evidence. *See United States v. Hurtado,* 905 F.2d 74, 76 (5th Cir.1990) (en banc) (overruling previous decisions requiring the government to prove voluntariness by clear and convincing evidence).

We have studied the record in light of the following factors: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *United States v. Gonzalez–Basulto,* 898 F.2d 1011, 1013 (5th Cir.1990) (citing *United States v. Galberth,* 846 F.2d 983, 987 (5th Cir.), *cert. denied,* 488 U.S. 865, 109 S.Ct. 167, 102 L.Ed.2d 137 (1988)).

We believe that two of the relevant factors support Yeagin's argument that the consent was not voluntary. First, Yeagin's custodial status was certainly not voluntary; he had been handcuffed and escorted by officers to another room for questioning. Second, Yeagin knew that incriminating evidence would be found if he agreed to the search.

The other four factors, however, support the district court's conclusion that the consent was voluntary. The government presented testimony by four government witnesses who participated in arresting and questioning Yeagin. The evidence indicates that the officers used no coercion in obtaining Yeagin's consent to search the hotel room. They properly advised Yeagin of his right to counsel and his right to

---

**1.** The district judge recognized that evidence of nine prior convictions would have an extremely prejudicial impact on the jury.

remain silent. Yeagin's only support for his coercion argument is that he was shirtless and the officers were armed. We find this argument, however, unconvincing.

The second factor that supports a finding of voluntariness is that the consent statement clearly said that Yeagin understood his right to refuse consent. The third factor, cooperativeness, also supports the government's argument. Yeagin was cooperative throughout the incident, even telling the officers about the firearms and drugs in the room before they searched it. Finally, Yeagin is a person of average intelligence who has obtained a G.E.D. He was capable of understanding his rights and making a voluntary choice to consent to the search.

Based on these factors and on the totality of the circumstances in this case, we conclude that Yeagin voluntarily consented to the search of the room. *See United States v. Cherry*, 794 F.2d 201, 205 (5th Cir.1986), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987). The evidence obtained in the consent search was, therefore, admissible.

*Evidence of Prior Convictions*

■■■■ The government concedes that the district court erred in admitting four of Yeagin's prior convictions because they were not necessary or relevant to any issue.[2] Without analyzing the evidence further, we might conclude that this error was prejudicial and remand the case for a new trial. However, to provide guidance to the district court in retrying the case, we also consider the admissibility of evidence of the other five prior crimes.[3]

Without any offer to stipulate from Yeagin, evidence of these five prior drug felonies might have been relevant to two essential elements of the government's case. First, under the first count, possession of drugs with intent to distribute, intent was an essential element; thus, evidence of these prior crimes might have

been admissible to show intent under Federal Rule of Evidence 404(b). Second, under the third count, possession of a firearm by a convicted felon, the government had to show that the defendant had committed a prior felony.

Yeagin, however, offered to stipulate two key facts. First, on the first count, if the government proved possession, he would stipulate that he had the requisite intent to distribute. Second, on the third count, he would stipulate that he had prior felonies. Yeagin argues that he made this offer so that the jury would consider only the charges against him instead of unfairly convicting him based on the inference that he was acting in conformity with past misconduct.

In *Webb* this Circuit upheld a conviction for shooting a passing helicopter despite a claim that the trial court erred by admitting testimony that someone else on the defendant's property shot at the helicopter several days after the incident in the indictment. *See United States v. Webb*, 625 F.2d 709 (5th Cir.1980). The Court explained, "We may assume, without deciding, that if [the defendant] had offered so to stipulate in advance of trial [that his sole defense was an alibi and not lack of intent], the Government's need might have diminished to the point where admission of the subsequent incident would have been error." *Id.* at 710 (citing *United States v. Mohel*, 604 F.2d 748, 752–53 (2d Cir.1979); *United States v. Manafzadeh*, 592 F.2d 81, 87 (2d Cir.1979)).

In another Fifth Circuit case, a defendant on trial for escape from federal custody offered before trial to stipulate to his prior conviction. *See United States v. Spletzer*, 535 F.2d 950 (5th Cir.1976). The trial court, over defense objection on the grounds of irrelevance and prejudice, admitted into evidence a certified copy of the defendant's prior conviction. *Id.* at 953.

---

**2.** Both parties agree that the following prior crimes were inadmissible: (1) robbery by firearm, (2) making a false statement on a firearm acquisition form, (3) forgery, and (4) burglary of a building.

**3.** The other five prior crimes were as follows: (1) possession of morphine, (2) possession of cocaine, (3) delivery of marijuana, (4) distribution of marijuana, and (5) possession of marijuana with intent to distribute.

The Fifth Circuit reversed the conviction, concluding that the evidence was erroneously admitted. *Id.* at 956.

In *Spletzer*, we concluded that "as a general rule a party may not preclude his adversary's proof by an admission or offer to stipulate." *Id.* at 955. In another case, we further explained: "We will not adopt an inflexible rule that allows a party by stipulation to prevent his adversary's case from being presented in its appropriately full and real life context." *United States v. Davis*, 792 F.2d 1299, 1305 (5th Cir.), *cert. denied*, 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986).

Yet this general principle does not provide the answer in the present case; Yeagin's nine prior felonies were unrelated to the factual circumstances of the charged offense. Yeagin was not trying to prevent his adversary from presenting the "full and real life context" of the offense. *Davis*, 792 F.2d at 1305. Instead, he was trying to prevent the jury from improperly basing its conclusion on evidence that he had a propensity for crime.

As we noted in *Spletzer*, when "the probative value of relevant evidence is substantially outweighed by its potential for unfair prejudice, it should be excluded. An important consideration relating to probative value is the prosecutorial need for such evidence." *Id.* at 955–56 (citation omitted).

The prosecutor, of course, claims that he sorely needed this evidence. In this appeal, he contends for the first time that the evidence was admissible because it tended to prove elements other than the elements to which the defendant had agreed to stipulate. *See Davis*, 792 F.2d at 1305. Thus, the argument goes, even though Yeagin offered to stipulate to his intent to distribute on the drug count and to prior felonies on the firearm count, his prior crimes remained relevant on another essential element of the case—the intent or knowledge required for possession.

The district court instructed the jury as follows on possession with intent to distribute:

To "possess with intent to distribute" simply means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

Possession, as that term is used in this case, may be of two kinds: actual possession and constructive possession. A person who knowingly has direct physical control over a thing at a given time is then in actual possession of it.

A person who, although not in actual possession *knowingly has both the power and the intention* at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

(emphasis added). The prior crimes evidence could not have been relevant to the intent described in the first paragraph of this passage because Yeagin had offered to stipulate to that intent if the government could prove possession. The evidence was also irrelevant to the knowledge required for actual possession because there was no evidence that indicated that Yeagin had direct physical control over the drugs.

Instead, according to the government, the evidence was relevant to the issue of knowledge or intent required for constructive possession. The government somewhat enigmatically calls this element a broad notion of intent or "state of mind." It further claims that this element somehow relates to Yeagin's motive for being in the room. Clouding the issue even further, the government argues that the jury needed the evidence to decide whether Yeagin was in the room by mistake or accident.

The government contends that these elements were essential to the case because Yeagin's defense was based on a claim that he was merely present in the room and not really involved in any wrongdoing. We find this argument disingenuous, however, because the district court soundly rejected Yeagin's proposed jury instruction on the defensive theory of mere presence. *See United States v. Cordova–Larios*, 907 F.2d 40, 42 (5th Cir.1990) (holding that "[a] defendant is entitled to have the jury instructed on a theory of the defense for

which there is any foundation in the evidence").

We agree that constructive possession includes some element of knowledge or intent. We also agree that Yeagin's past drug-related crimes might have been relevant on the issue of whether Yeagin intended at the time of his arrest to exercise dominion or control over the drugs in room 638. This evidence, however, was highly prejudicial to Yeagin. It provided direct support only for the one inference specifically forbidden by rule 404(b): that because Yeagin had committed drug crimes in the past, he had a bad character and a propensity to commit such crimes again.

Other crimes evidence is not admissible merely because the government manages on appeal to identify some broad notion of intent lurking behind the element of possession. A trial judge faced with the problem of admissibility of other crimes evidence should exercise caution and should require the government to explain why the evidence is relevant and necessary on a specific element that the government must prove. *See United States v. O'Connor,* 580 F.2d 38, 43 (2d Cir.1978). Otherwise, "the accused might be convicted because of his participation in other crimes rather than because he is guilty beyond a reasonable doubt of the crime alleged." *United States v. Manafzadeh,* 592 F.2d 81, 86 (2d Cir.1979).

We believe that the prosecutor's need to introduce evidence of Yeagin's nine prior convictions was negligible in comparison to the extremely prejudicial effect that this evidence must have had on the jury. Because we conclude that admission of this evidence was prejudicial error, we reverse the conviction and remand the case for a new trial. We therefore find it unnecessary to consider the other issues raised in this appeal.

### REVERSED and REMANDED.

Appeal from the United States District Court for the Western District of Texas; H.F. Garcia, Judge.

### ON PETITION FOR REHEARING

March 14, 1991.

PER CURIAM.

On its petition for rehearing, the government correctly identifies in our original opinion a potential ambiguity created by the use of the phrase "career criminal" instead of the phrase "convicted felon." As the government notes, this Court has established that the sentencing court, and not the jury, should consider proof of armed career criminal status under 18 U.S.C. § 924(e) (1988). *See, e.g., United States v. Quintero,* 872 F.2d 107, 110 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 2586, 110 L.Ed.2d 267 (1990); *United States v. Affleck,* 861 F.2d 97, 98–99 (5th Cir.1988), *cert. denied,* 489 U.S. 1058, 109 S.Ct. 1325, 103 L.Ed.2d 593 (1989). The jury's concern, in contrast, is whether the defendant had a prior felony conviction, thus making possession of a firearm unlawful under 18 U.S.C. § 922(g)(1) (1988).

To prevent any unintended conflict between *Yeagin* and the cases construing armed career criminal status as a sentencing factor, we have deleted the following sentence:

> Second, under the third count, possession of a firearm by a *career criminal,* the government had to show that the defendant had committed *other felonies.*

In its place, we have substituted:

> Second, under the third count, possession of a firearm by a *convicted felon,* the government had to show that the defendant had committed a *prior felony.*

Similarly, elsewhere in the case we have substituted the phrase "firearm count" for the phrase "armed career felon count." These minor revisions correct any potential ambiguity caused by the phrase "career felon." The petition for rehearing is therefore DENIED.