UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-4879
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,


versus


DANIEL MICHAEL KELLEY,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Eastern District of Texas
_____
(January 20, 1993)

Before JOLLY and DeMOSS, Circuit Judges, and SCHWARTZ[*], District
Judge.

E. GRADY JOLLY, Circuit Judge:

Daniel Michael Kelley was convicted for possession of cocaine
with intent to distribute, using and carrying a firearm during and
in relation to the drug trafficking crime, and possession of a
firearm as a convicted felon.  He appeals, contending that the
district court erred in denying his motion to suppress.  He also
complains of prosecutorial misconduct, errors in evidentiary

_____

[*]District Judge of the Eastern District of Louisiana, sitting
by designation.

rulings, and misapplication of the Sentencing Guidelines. Finding no reversible error, we **AFFIRM**.

I

On November 9, 1990, Kelley and Sondra Andrews drove Andrews's car from Butler, Alabama, to Houston, Texas. They spent the night at a motel in Houston, and left the following day, headed east on Interstate 10 toward Beaumont. As the vehicle approached Beaumont, two Beaumont police officers, Froman and LaChance, observed that Andrews was seated near the middle of the front seat. They began to follow the vehicle, and observed that Kelley was not wearing a seatbelt, because the buckle was hanging down over his left shoulder. The officers decided to stop the vehicle for the seatbelt violation.

Andrews and Kelley both testified that Kelley got out of the car and walked back to the police car, but the officers testified that they approached Andrews's vehicle while Kelley and Andrews were both still inside the vehicle. In any event, Kelley presented his driver's license to the officers at their request. Froman asked Kelley to step to the rear of the vehicle, while LaChance questioned Andrews. When asked about the reason for their trip to Houston, Andrews and Kelley gave inconsistent answers. Based on that fact, as well as the apparent nervousness of both Kelley and Andrews, the officers decided to ask for consent to search the vehicle. Andrews signed a consent form for the search.

During the search, Officer Froman found a loaded .38 caliber revolver in the glove compartment.  On the right floorboard was a blue canvas bag containing approximately $4,000 in currency.  In the trunk, he found a loaded .45 caliber pistol, and a soft body armor ballistics vest.  While the officers were questioning Andrews about these items, Kelley fled on foot into the wooded area across the interstate.  Froman unsuccessfully pursued him, and Kelley remained free until apprehended in Alabama approximately six months later.

After Kelley fled, Andrews was arrested for unlawful carrying of weapons, and was placed in the back seat of the police car to await the arrival of a female officer to perform a body frisk. Later, after she had been taken to jail, Andrews told the officers that, immediately before the stop, Kelley had handed her a bag of cocaine and told her to hide it in her pants, and she had complied. When she was placed in the back seat of the patrol car, she took the cocaine out of her pants and hid it under the front passenger seat.  A search of the police car later that evening resulted in the discovery of approximately ten ounces of cocaine underneath the front seat behind which Andrews had been sitting.

II

Kelley was charged with possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and possession of a

firearm as a convicted felon, in violation of 18 U.S.C. § 922(g). The district court denied his motion to suppress the evidence seized in the search of Andrews's automobile.

Andrews entered into a plea agreement and testified against Kelley at the suppression hearing and at trial. The jury found Kelley guilty on all three counts. He was sentenced to 240 months on the cocaine possession count, to run concurrently with a sentence of 327 months on the felon-in-possession count. He was also sentenced to a consecutive term of 60 months imprisonment on the firearm count. He filed a timely notice of appeal.

### III

Kelley contends that the district court erred in denying his motion to suppress. He further contends that the district court erred in admitting evidence of his flight from the scene of the search, in ruling that an expunged conviction under the Youthful Offender Act was admissible, in overruling his objection to the prosecutor's closing argument, and in applying the Sentencing Guidelines.

### A

Kelley contends that the evidence seized in the search of the car should have been suppressed, because the valid stop for seatbelt violations became an illegal detention when the police officers conducted an investigation that was not reasonably related to the justification for the stop. He further contends that

-4-

Andrews's consent was involuntary, because it was the product of the allegedly illegal detention.[1]

(1)

"The proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." United States v. Smith, 978 F.2d 171, 176 (5th Cir. 1992). We review the district court's findings of underlying facts for clear error; questions of law are reviewed *de novo*. Id. In evaluating the legality of investigatory stops, we consider (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place. Terry v. Ohio, 392 U.S. 1, 19-20 (1968).

Kelley acknowledges that United States v. Causey, 834 F.2d 1179 (5th Cir. 1987) (en banc), forecloses the contention, which he made to the district court, that the stop for seatbelt violations was a mere pretext to allow the officers to search for drugs or weapons. Accordingly, he now concedes that the stop was justified

---

[1]Although it argued to the district court that Kelley lacked standing to challenge the legality of the search, the government now concedes Kelley's standing. Andrews testified that Kelly was driving her car with her permission. Moreover, he had a legitimate expectation of privacy with respect to the contents of his suitcase, which was in the trunk of Andrews' car. Therefore, we agree that he has standing to contest the legality of the search. See Rakas v. Illinois, 439 U.S. 128, 142 n.11, 148 (1978); United States v. Martinez, 808 F.2d 1050, 1056 (5th Cir.), cert. denied, 481 U.S. 1032 (1987).

at its inception.  However, he contends that the investigation conducted by the officers was not reasonably related in scope to the purpose of the stop.  According to Kelley, once the officers obtained his driver's license, they should have issued a citation or a warning and refrained from any further questioning or investigation.[2]  He urges us to adopt the rationale of two cases from the Tenth Circuit, which has expressly rejected Causey.[3]

In United States v. Guzman, 864 F.2d 1512 (10th Cir. 1988), an officer stopped the defendant and his wife for seatbelt violations. While writing a warning for the seatbelt violation, the officer asked the defendant "whether his wife was employed, where he was headed, where he worked, when he got married, and if they were carrying any large sums of money."  Id. at 1514.  After completing the warning and handing it to the defendant, but without advising the defendant that he was free to leave, the officer asked the defendant if they were carrying weapons or contraband.  The

_____

[2]The officers did not issue traffic citations for the seatbelt violations.

[3]In United States v. Smith, 799 F.2d 704 (11th Cir. 1986), the Eleventh Circuit held that "in determining when an investigatory stop is unreasonably pretextual, the proper inquiry ... is not whether the officer *could* validly have made the stop but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose."  Id. at 709.  In Causey, our en banc court rejected the Smith text, holding that, "so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry."  Causey, 834 F.2d at 1184.  In United States v. Guzman, 864 F.2d 1512 (10th Cir. 1988), the Tenth Circuit adopted the Eleventh Circuit's test, rejecting Causey.  Guzman, 864 F.2d at 1515-17.

defendant replied that they were not hiding anything and that the officer was free to look.  Id.  The defendant signed a consent to search form.  During the search, the officer found five kilograms of cocaine and $45,000 cash.  Id.

The Tenth Circuit held that the seizure was unreasonable, stating:

> An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation.  When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.  In order to justify a temporary detention for questioning, the officer must also have reasonable suspicion of illegal transactions in drugs or of any other serious crime.

Id. at 1519 (citations and internal quotations omitted).  The court, however, remanded the case to the district court for findings of fact on the issue of consent. Id. at 1520.

In United States v. Walker, 933 F.2d 812 (10th Cir.), reh'g denied, 941 F.2d 1086 (10th Cir. 1991), cert. denied, ___ U.S. ___, 112 S. Ct. 1168 (1992), the defendant was stopped for speeding. After confirming that the vehicle was not stolen, the officer obtained the defendant's driver's license and vehicle registration. Id. at 813-14.  Upon discovering that the vehicle was registered in a different name, the officer questioned the defendant and received satisfactory information that he was a permissive operator. Id. at 814.  The defendant appeared to be nervous, so the officer asked

whether he was carrying any weapons, open containers of alcohol, drugs or drug paraphernalia. Id. The defendant replied that he was not, but stated that he had $1600 in the glove compartment and $150 in his pocket. Id. The officer then obtained the defendant's consent to search the vehicle, and discovered 86 kilograms of cocaine. Id.

The Tenth Circuit held that the initial stop was valid, but that the continued detention and questioning unrelated to the traffic violation were unreasonable. Id. at 816. In its opinion denying the government's motion for rehearing, the court stated:

> We think that this type of questioning--about matters unrelated to the reason for the stop--would naturally engender fear and resentment in otherwise law-abiding citizens who expect to be detained briefly for the purpose of receiving a traffic citation.

941 F.2d at 1088. Relying on Guzman, the court remanded the case to the district court for findings on the issue of the voluntariness of the defendant's consent. 933 F.2d at 817-18.[4]

Kelley maintains that the officers' questioning of him and Andrews concerning the purpose for their trip to and from Houston, like the questioning involved in Guzman and Walker, unreasonably exceeded the scope of investigation necessary to dispose of the seatbelt violations.

---

[4]On remand, the district court found that the defendant's consent was not voluntary. United States v. Walker, ___ F. Supp. ___, 1992 WL 356699 (D. Utah Aug. 17, 1992).

The following is a summary of the evidence at the suppression hearing relevant to the legality of the detention. Officer Froman testified that on November 10, 1991, he and his partner, Officer LaChance, were operating their police vehicle on Interstate 10 in Beaumont, Texas. They observed a red Plymouth occupied by two persons, traveling in an easterly direction on Interstate 10, which links Houston, to the west, and Beaumont, to the east. The female passenger was sitting in the middle of the front seat, almost in the male driver's lap. As they began to follow the vehicle, Froman observed that the driver was not wearing a seatbelt because the buckle was visible from the rear, hanging over the driver's left shoulder. They stopped the vehicle because neither occupant was wearing seatbelts, as required by state law.

Froman testified that he approached the driver's side and obtained Kelley's driver's license, and then asked Kelley to exit and step to the rear of the vehicle. Froman stated that, while walking back to the rear of the vehicle, he observed that Kelley appeared to be nervous. According to Froman, Kelley's hands were shaking and his voice quavered; he was fidgeting and couldn't stand still. Froman testified that Kelley told him that he and Andrews had been to Houston for a couple of days, visiting friends. Froman then spoke to Andrews, who stated that she had no idea why they had been in Houston, but that they had been there since the previous day and had spent the night in a motel. Froman testified that

Andrews was even more nervous than Kelley. Based on the conflicting statements, nervousness, and the fact that Houston is a "major source city," Froman asked Andrews if they were transporting any narcotics or weapons. She replied that they were not. He then asked her for permission to search the vehicle, and she consented.

Officer LaChance testified that he spoke to Andrews while she was seated in the vehicle. He observed that both Kelley and Andrews were nervous. After obtaining Andrews's driver's license and learning that she was the owner of the vehicle, LaChance asked her why she was not wearing her seatbelt. He could not remember her answer. He then asked her where they had been, and she stated that they were coming from Houston. He asked her what they were doing in Houston, and she replied, "I don't know, I just came for the ride." LaChance testified that he considered that response rather odd, because passengers usually know where they are going and why. According to LaChance, his questioning of Andrews was just "normal conversation," but when he noticed that she was nervous, he wanted to find out why. LaChance testified that they requested permission to search the vehicle because both Kelley and Andrews appeared to be nervous, and because of Andrews's inconsistent answers to his questions.

Andrews testified that she and Kelley were not wearing seatbelts at the time of the stop. According to Andrews, Kelley got out of the car and walked back to the patrol car. One of the

officers talked to Kelley and the other one talked to her. He asked where they were going and what they were doing. Although she knew that they had gone to Houston and gotten drugs, she did not tell the police officer.

Kelley also testified that he approached the police officers' vehicle immediately after the stop. According to Kelley, the officers did not immediately ask for his driver's license, but instead told him to put his hands on the car, and searched him. Kelley testified that they asked him a number of questions, but that the questions were asked so rapidly and in such an angry manner that he did not have time to respond to any of them. Kelley further testified that the officers searched the vehicle prior to obtaining Andrews's consent.

The only evidence in the record about the length of the detention is that approximately five minutes elapsed between the time the vehicle was stopped and the time Andrews consented to the search. As the Tenth Circuit held in Guzman, the officers were entitled to request a driver's license and vehicle registration, run a computer check, and issue a citation. We also think that, under the circumstances of this stop, they were entitled to engage in conversations with Kelley and Andrews in order to determine whether, for example, Kelley was operating Andrews's vehicle with her permission, and whether Andrews was being held against her will. The officers did not issue warnings or citations for the seatbelt violations, and there is no evidence in the record

-11-

regarding the amount of time that it would have taken to do so. See Walker, 933 F.2d at 816 n.2 (noting that the court's determination that the defendant was unlawfully detained might have been different if the questioning had not delayed the stop beyond the time necessary for issuance of a citation).

We do not disagree with the Tenth Circuit that, under appropriate circumstances, extensive questioning about matters wholly unrelated to the purpose of a routine traffic stop may violate the Fourth Amendment. However, it is unnecessary for us to determine whether the questioning that took place here constituted an unreasonable detention, because, even if it did, we hold, consistent with all other authorities, that Andrews's valid voluntary consent to the search cured any Fourth Amendment violation that may have occurred. We now turn to the issue of consent.

(3)

As the Tenth Circuit recognized in Guzman and Walker, voluntary consent can validate a search even when the consent to search is preceded by a Fourth Amendment violation. Guzman, 864 F.2d at 1520-21; Walker, 933 F.2d at 817-18. Our court also has long recognized this principle. See, e.g., United States v. Ballard, 573 F.2d 913, 916 (5th Cir. 1978) (holding that consent can, in proper circumstances, validate a search following an illegal arrest).

-12-

"To be valid, consent to search must be free and voluntary." United States v. Olivier-Becerril, 861 F.2d 424, 425 (5th Cir. 1988). The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary. United States v. Yeagin, 927 F.2d 798, 800 (5th Cir. 1991). Where consent is preceded by a Fourth Amendment violation, the government has a heavier burden of proving consent. United States v. Ruigomez, 702 F.2d 61, 65 (5th Cir. 1983). The voluntariness of consent is "a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). We will not reverse the district court's finding that consent was voluntary unless it is clearly erroneous. Olivier-Becerril, 861 F.2d at 425-26. "Where the judge bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the judge had the opportunity to observe the demeanor of the witnesses." United States v. Sutton, 850 F.2d 1083, 1086 (5th Cir. 1988).

In evaluating the voluntariness of consent, we have considered six factors:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

Olivier-Becerril, 861 F.2d at 426 (citations omitted). All six factors are relevant, but no single one is dispositive or controlling. Id.

This case presents a somewhat unusual scenario, because the individual who consented to the search, Andrews, entered into a plea bargain with the government and testified in this proceeding that her consent was voluntary. Therefore, our focus in applying the factors relevant to voluntariness is not on the defendant, Kelley, who is challenging the voluntariness of Andrews's consent, but on Andrews. A similar situation was involved in United States v. Ruigomez. There, the defendant, Ruigomez, was seized while he was in a car with Valderrama. Our court held that Valderrama, who had joint control over the automobile, voluntarily consented to the search, and that his consent precluded Ruigomez's objection to the propriety of the search. 702 F.2d at 65-66.[5]

Andrews, who owned the car in which she and Kelley were traveling at the time of the stop and search, testified that she read the consent form before freely and voluntarily signing it. She further testified that she was not coerced or threatened. The consent form signed by Andrews informed her of her right to refuse

_____

[5]As we noted in Ruigomez, other defendants have also been in Kelley's position and have had to suffer the consequences of their companions' consent. See United States v. Baldwin, 644 F.2d 381 (5th Cir. 1981) (defendant's wife consented to search of her car after defendant refused to consent); United States v. Hall, 587 F.2d 177 (5th Cir.) (defendant's wife consented to search of his house following his arrest), cert. denied, 441 U.S. 961 (1969).

permission to search.  Officer Froman testified that he explained the consent to search form to Andrews, allowed her to read it, and asked her if she had any questions.  She replied that she did not, and signed the form.  Based on this evidence, the district court found:

> The court now finds, pursuant to the motion to reconsider, by a preponderance of the evidence, based upon the testimony of Officer Froman and co-defendant Andrews, that her consent to search was given freely, voluntarily, knowingly, and without coercion.  This consent, this Court believes, validated the search of the car owned by co-defendant Andrews, who is not contesting the voluntariness of consent, or the validity of the search.
>
> Government's Exhibit 1 at [the suppression hearing] is the consent form, and in that form it explains to Ms. Andrews, who signed the form, that she had a right not to consent, and could refuse consent.  The testimony at the hearing was that she read the form, had no questions about the form, understood the form, and voluntarily signed the form.

These findings are not clearly erroneous.  Although Andrews was not being detained voluntarily at the time she consented to the search, the fact that she and Kelley were under detention does not preclude a finding of voluntariness.  See Ruigomez, 702 F.2d at 65-66.  There is no evidence that the police engaged in any coercive activity.[6]  Andrews was cooperative, and was aware of her right to

---

[6]Andrews and Froman both testified that the vehicle was searched after Andrews signed the consent form.  Kelley testified that the police searched the car before obtaining Andrews' consent.  The resolution of this contradictory testimony was a credibility choice for the district court--one that we will not disturb.

refuse to consent. There is no evidence that she lacked the ability to understand her rights. It is unclear whether Andrews believed that incriminating evidence would be found during the search. Apparently she was aware that Kelley had guns in the car, and she had hidden the cocaine in her pants. Perhaps she believed that the search would reveal only evidence that would incriminate Kelley, and not incriminate her. In any event, we find that the factors, considered as a whole, support the district court's finding that Andrews voluntarily consented to the search.

Kelley urges us to apply the three-factor test for evaluating the validity of consent following an illegal detention announced in United States v. Berry, 670 F.2d 583 (5th Cir. Unit B 1982) (en banc). There, the court held that the factors to be considered include (1) the temporal proximity of an illegal arrest and consent, (2) intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. Id. at 605 (citing Brown v. Illinois, 422 U.S. 590, 601, 603-04 (1975)). In Guzman and Walker, the Tenth Circuit also held that the Brown factors should be applied in determining whether the consents in those cases were voluntary. Guzman, 864 F.2d at 1520-21; Walker, 933 F.2d at 817-18.

Even if we assumed that the detention here was illegal, and apply the Brown factors, we would nevertheless affirm the district court's finding that Andrews's consent was voluntary. It is true, as Kelley correctly asserts, that no significant period of time

-16-

elapsed between the allegedly illegal detention and Andrews's consent. That factor alone, however, is not dispositive. Kelley maintains that Andrews's inability to consult with an attorney or to reflect on her decision to give consent negates the presence of intervening circumstances. In United States v. Fike, 449 F.2d 191 (5th Cir. 1971), however, our court held that advising a defendant of his right to refuse to permit a search was a sufficient intervening occurrence to remove the influence of a prior Fourth Amendment violation. Similarly, in United States v. Ballard, 573 F.2d 913 (5th Cir. 1978), our court relied on two factors--the absence of any coercive tactics and the fact that the defendant was informed of the right to refuse to permit the search--in holding that consent was voluntary following a Fourth Amendment violation. There is no evidence that Officer Froman and Officer LaChance engaged in any coercive police tactics. Moreover, Andrews was informed of her right to refuse consent. Accordingly, under our precedents, these factors constitute sufficient intervening circumstances to purge the taint of illegality from any unreasonable detention.

The district court's finding that Andrews voluntarily consented to the search is not clearly erroneous. Accordingly, Kelley "is precluded from complaining about the search of the automobile." See Ruiqomez, 702 F.2d at 66.

B

After the weapons, cash, and body armor were discovered during the search of Andrews's car, Kelley fled from the scene and was not apprehended until six months later. Kelley filed a motion in limine, seeking to exclude evidence of his flight from the scene based upon Fed. R. Evid. 403, maintaining that the "slight" probative value of such evidence was substantially outweighed by the danger of unfair prejudice. The district court denied the motion, as well as his requested instruction to the jury to disregard such evidence.

Kelley contends that, because he was a convicted felon, evidence of his flight following the discovery of the weapons was unduly prejudicial, because even an innocent man with a prior felony conviction could be motivated to flee out of a fear of prosecution. We reject that contention. Our court has long held that "evidence of an accused's flight is generally admissible as tending to establish his guilt." United States v. Williams, 775 F.2d 1295, 1300 (5th Cir. 1985), cert. denied, 475 U.S. 1089 (1986). The jury was properly instructed on the law concerning the evidence of flight, and we find no reversible error.

C

Outside the presence of the jury, and pursuant to Fed. R. Evid. 404(b), the government offered evidence of Kelley's prior convictions for the purpose of establishing the intent element of the felony possession charge. Over Kelley's objection that the

-18-

government had failed to give notice of its intention to use such evidence on the issue of intent, the district court ruled that Kelley's 1979 federal conviction on drug charges was admissible. The district court denied Kelley's counsel's request to brief the issue. To avoid the introduction of evidence of that drug conviction, Kelley stipulated that, in the event the possession element was established, intent to distribute existed. See United States v. Yeagin, 927 F.2d 798 (5th Cir. 1991) (reversing conviction because of prejudicial effect of evidence of nine prior felony convictions, where government refused to accept defendant's offer to stipulate intent to distribute). Pursuant to the stipulation, evidence of the conviction was not admitted.

Kelley later discovered, after the trial, that the 1979 conviction was under the Youthful Offender Act, and now contends that the conviction was automatically expunged in 1985. He therefore asserts that the ruling that the conviction was admissible constitutes reversible error.

Under to Fed. R. Evid. 404(b), "[e]vidence of other crimes, wrongs, or acts, is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. Although for the purposes of this discussion, we accept Kelley's assertion that the 1979 conviction was automatically expunged, we nevertheless

hold that the district court's ruling was not reversible error. Evidence admissible under Rule 404(b) is not limited to convictions, but also includes other "wrongs" or "acts." Therefore, the acts underlying Kelley's 1979 conviction were admissible for the purpose of proving intent to distribute the cocaine, even if the conviction itself was not.

D

In his closing argument, Kelley's attorney attacked Andrews's credibility, focusing on her prior, sworn, inconsistent statements. During the government's rebuttal in closing argument, the prosecutor stated that the evidence introduced at trial would have been the same whether or not Andrews had made a deal with the government:

> The truth is, we don't need Sondra Andrews. Sondra Andrews could be sitting right there as a Defendant and we would still be trying this case, just like this. The same evidence would have come in. You would have the stop out there, you would have found these guns, you would have found this body armor.
>
> This is not Sondra Andrews' body armor. This is his body armor. The same evidence would have come in. The same evidence of the cocaine and the same evidence of his flight.

Kelly objected, maintaining that the comment constituted bolstering of Andrews's testimony, was speculative, and was not based on evidence adduced at trial. He contends that the district court erred in overruling his objection.

Our "task in reviewing a claim of prosecutorial misconduct is to decide whether the misconduct casts serious doubt upon the correctness of the jury's verdict." United States v. Carter, 953 F.2d 1449, 1457 (5th Cir.), cert. denied, ___ U.S. ___, 112 S. Ct. 2980 (1992). In making that determination, we consider: "(1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instructions; and (3) the strength of the evidence of the appellant['s] guilt." Id.

Applying those factors, we hold that the prosecutor's comments did not deprive Kelley of a fair trial. The comment that the same evidence would have been introduced in the absence of Andrews's testimony does not constitute "bolstering", nor does it imply that there was other evidence, not adduced at trial. Instead, the prosecutor merely responded to Kelley's closing argument, and urged the jury to consider the other evidence of Kelley's guilt even if it chose to disregard Andrews's testimony. With respect to the second factor, the jury was instructed to consider only the evidence and that the attorneys' arguments were not evidence. See United States v. Ellender, 947 F.2d 748, 758 (5th Cir. 1991). Finally, the evidence of Kelley's guilt was substantial. We therefore conclude that the prosecutor's remarks cast no doubt upon the correctness of the jury's verdict.

Sentencing

Finally, Kelley contends that the district court erred in sentencing him as an "armed career criminal," because he lacked three prior convictions for serious drug offenses committed on separate occasions. See 18 U.S.C. § 924(e)(1); U.S.S.G. § 4B1.4. Kelley acknowledges that he has at least three prior convictions for serious drug offenses, but contends that those convictions arose from only two "courses of conduct."

The record reflects that Kelley was convicted in Alabama on December 3, 1979, for two counts of delivery of cocaine. The deliveries occurred on January 25 and February 8, 1979, and involved sales to undercover officers in Choctaw County, Alabama, and in Toxey, Alabama. In addition, Kelley was convicted in Florida on September 13, 1982, for possession of a controlled substance, and was convicted in Alabama on May 9, 1983, for giving away marijuana. Kelley maintains that the two 1979 convictions should be treated as only one conviction for purposes of the Armed Career Criminal Act, because they arose out of the same course of conduct. He also maintains that the 1982 and 1983 convictions in Florida and Alabama should be counted as only one conviction, because they arose from a single conspiracy to harvest and distribute marijuana.

In United States v. Herbert, 860 F.2d 620 (5th Cir. 1988), cert. denied, 492 U.S. 927 (1989), our court interpreted the Armed

Career Criminal Act, and concluded that "multiple convictions arising from multiple criminal transactions should be treated as separate convictions, regardless of the number of judicial proceedings involved in the conviction." Id. at 622. Kelley's 1979 state convictions involved two separate deliveries of drugs on separate days at separate locations. We therefore "have no difficulty in holding that these instances were separate criminal transactions." See Herbert, 860 F.2d at 622 n.1.; see also United States v. Medina-Gutierrez, ___ F.2d ___, ___, 1992 WL 380462, *2 (5th Cir. Dec. 23, 1992) (holding that three burglaries, committed within weeks of one another, and which defendant argued were part of a "common plan," were committed "on occasions different from one another" within the meaning of 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4). Accordingly, even if the 1982 and 1983 convictions are treated as one conviction, which we need not address, Kelley has the requisite number of convictions for sentencing pursuant to the Armed Career Criminal Act. Accordingly, the district court did not err in sentencing him as an armed career criminal.

IV

For the reasons we have set out in this opinion, the judgment of the district court is

A F F I R M E D.