UNITED STATES of America, Appellee,

v.

Salvador RAMOS, Appellant.

UNITED STATES of America, Appellee,

v.

Servando RAMOS, Appellant.

Nos. 93–2726, 93–2739.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1993.

Decided March 31, 1994.

JACKSON, District Judge.

Salvador Ramos and Servando Ramos were convicted of possessing marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c). For reversal, the defendants argue that the district court erred in denying their motions to suppress evidence seized during a warrantless search of their vehicle. We agree and accordingly reverse the defendants' convictions.

## I. BACKGROUND

At approximately 7:00 A.M. on August 12, 1992, Trooper Brian Abernathy of the Iowa Highway Patrol saw a pickup truck bearing Texas license plates traveling east on Interstate Highway 80 near Davenport, Iowa. When the truck passed him, Abernathy saw that the front seat passenger was not wearing a seatbelt as required by Iowa law.[1] Abernathy followed the truck and, by activating the flashing red lights of his patrol car, signaled the truck to pull over to the side of the highway.

As Abernathy walked toward the truck, the driver, Salvador Ramos, began to exit and was told to get back inside the truck. After explaining the reason for the stop, Abernathy asked the passenger, Servando Ramos, for identification. Servando complied by producing a driver's license. Thereafter, in response to the officer's request, Salvador produced his driver's license. With the defendants' identification materials in hand, Abernathy then asked Salvador to accompany him to his patrol vehicle. Salvador agreed and Servando remained in the truck. Abernathy testified that upon receiving Servando's identification he had all the information necessary to prepare a citation for the seatbelt violation and that he had no need for Salvador's driver's license. Abernathy fur-

Michael Burdette, Des Moines, IA, argued, for Salvador Ramos.

Chip Lowe, Des Moines, IA, argued, for Servando Ramos.

Edwin Kelley, Des Moines, IA, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, BEAM, Circuit Judge, and JACKSON,* District Judge.

* The HONORABLE CAROL E. JACKSON, United States District Judge for the Eastern District of Missouri, sitting by designation.
1. Under Iowa law, the driver and front seat occupant of a motor vehicle are required to wear fastened safety belts or harnesses while the vehicle is in motion. IOWA CODE § 321.445.2. The driver and the occupant may be charged separately for failing to use safety belts. IOWA CODE § 321.445.3.

ther testified that when he asked Salvador to accompany him to the patrol car he had no reason to suspect that either defendant was engaged in criminal activity.

Once inside the patrol car, Abernathy radioed for a computer check on the defendants and their truck. While awaiting a response to his inquiry, the officer prepared a seatbelt warning ticket to be issued to Servando and began conversing with Salvador. When asked about his destination, Salvador told the officer that he and Servando were going to Chicago to visit a sick cousin. He was unable, however, to respond to Abernathy's inquiry about the precise location in Chicago to which he and Servando were traveling. Abernathy also questioned Salvador abut his employment and continued to engage him in what Abernathy characterized as "idle chit chat."

Abernathy testified that after receiving a negative response to his computer inquiry, he returned the driver's license to Salvador.[2] He then asked Salvador to stay in the patrol car while he went to give the warning ticket to Servando. Abernathy testified that he found it suspicious that Salvador did not know what part of Chicago he was traveling to and he wanted Salvador to remain in the patrol car because he "wanted to expound a little bit on the fact that he [Salvador] didn't know where he was going ... [and] to engage in a little more conversation in that regard." When Abernathy returned to the pickup truck he gave Servando the warning ticket which bore the time 7:40 A.M. Abernathy then asked him about his destination and Servando responded that he was going to Chicago to visit a sick cousin. Abernathy also asked Servando whether there were any drugs or weapons in the truck.

Abernathy went back to his patrol car and again questioned Salvador, who was still seated inside, about where he was from and his destination. He also asked whether there were any weapons or drugs in the pickup truck. After Salvador responded in the negative, Abernathy asked for permission to search the truck. Salvador agreed and

signed a printed Consent to Search form that Abernathy prepared. The Consent to Search form also bore the time 7:40 A.M.

Abernathy then called for a second officer who arrived at the scene of the stop approximately 10 minutes later. The defendants were told to get out of the two vehicles and to stand in front of the patrol car. As he prepared to search the defendants' truck, Abernathy glanced at the fuel tank and noted spot welds at the seam. The welds did not appear to Abernathy to be sufficient to prevent leakage of fuel from the tank. Proceeding to the interior of the truck, Abernathy searched the passenger side but found nothing. He then walked to the rear of the truck, searched the tool box, and again noted the spot welds on the fuel tank.

Abernathy next entered the driver's side of the truck and inside a pouch on the door he found a .45 caliber shell. Behind the driver's seat were two boots, each containing a brown paper bag. Upon searching the first bag Abernathy found a number of .38 caliber bullets. When asked at that point whether there was a gun in the car, Salvador said that he was not sure but that his son might have placed one there. Abernathy then opened the second bag and found a .38 caliber handgun.

Exiting the truck again, Abernathy conducted a closer inspection of the fuel tank and made observations that suggested to him that the tank was not being used to store fuel. At Abernathy's request, Salvador agreed to drive the truck to a nearby gas station so that a thorough examination of the fuel tank could be made. However, before leaving the scene Salvador told Abernathy that the tank contained marijuana. The defendants also stated that they were carrying the marijuana to Chicago at the request of a Texas narcotics officer whom they were assisting in an investigation.

Following arrival at the gas station the fuel tank was searched and 159 pounds of marijuana were found inside. The defendants were given the *Miranda* warnings and

---

**2.** At the suppression hearing Salvador Ramos testified that Abernathy did not return the driver's licenses. The district court made no factual determination as to whether the licenses were returned to either defendant.

thereafter made further statements to the officers. At no point during the entire encounter was either defendant told that he was free to leave.

Before trial, the defendants moved to suppress the evidence seized pursuant to the warrantless search of the pickup truck as well as all statements the defendants made during and subsequent to the search. Following an evidentiary hearing, the district court found that Servando was not wearing a seatbelt and, therefore, the initial stop of the defendants' truck for this traffic violation was lawful. Based on the defendants' uncertainty about their destination, the foreign license plates on the truck and Abernathy's observations of the welds on the fuel tank, the court concluded that Abernathy had a reasonable, articulable suspicion that the defendants were involved in criminal activity. The court further concluded that Salvador voluntarily consented to the search of the truck, that the defendants were free to leave and were not in custody until they disclosed that there were working for the police in Texas, and that the defendants' inculpatory statements were obtained only after the *Miranda* warnings had been given. Thus, the court denied the motions to suppress.

A jury found the defendants guilty of both offenses charged in the indictment. Subsequently, each defendant was sentenced by the district court to a 51–month term of imprisonment on the marijuana charge and a consecutive 60–month term of imprisonment on the firearm charge.

## II. DISCUSSION

The sole issue presented for our review is whether the district court erred in denying the defendants' motion to suppress. The defendants initially argue that the court erred in determining that the stop of their vehicle was not pretextual in light of evidence demonstrating that Servando was wearing a seatbelt and that Abernathy had no clear view of Servando inside the truck as it traveled on the highway.

■ When a police officer observes a traffic violation—however minor—he has probable cause to stop the vehicle. *United*

*States v. Cummins,* 920 F.2d 498, 500 (8th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448–49 (1991); see *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Pillow,* 842 F.2d 1001 (8th Cir.1988). The district court, crediting Abernathy's testimony, found that Servando was not wearing a seatbelt and concluded that the officer lawfully stopped the defendants' truck. Whether a traffic stop is pretextual is a question of fact to be determined by the finder of fact. *United States v. Portwood,* 857 F.2d 1221, 1223 (8th Cir.1988), *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2073, 104 L.Ed.2d 638 (1989) (citing *Warren v. City of Lincoln,* 816 F.2d 1254, 1257 (8th Cir.1987)). The district court's implicit finding that the stop was not pretextual is not clearly erroneous and, as such, it will not be disturbed on appeal.

Although we agree with the district court that there was probable cause to stop the defendants' truck, our inquiry does not end here. In light of the lawfulness of the initial stop, the question becomes whether the resulting detention of the defendants was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *Cummins,* 920 F.2d at 502. Thus,

> For a detention to be reasonable, an officer's questions must relate to the purpose of the stop ... However, if the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.

*United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993) (citations omitted). We believe the district court erred in its application of *Terry, supra,* to the facts of this case.

■ In the instant case, after stopping the defendants' truck, Abernathy asked for and received Servando's driver's license. Although this was all the information he needed to write the seatbelt warning ticket, Abernathy asked for Salvador's license, too, and asked Salvador to go with him to the patrol car. Salvador, however, had committed no offense and his presence in the patrol car was unnecessary to Abernathy conducting

the computer inquiry or writing the warning ticket. Abernathy then proceeded to question Salvador about his destination and employment—matters that were wholly unrelated to the purpose of the initial stop. Salvador sat in the patrol car for roughly 40 minutes until Abernathy issued the warning ticket to Servando. By this time, Abernathy had verified that neither the defendants nor their vehicle were wanted for any criminal offense.

To justify a greater intrusion unrelated to the traffic stop, the totality of circumstances known to the officer must meet the requisite level of reasonable suspicion under *Terry*. See *Barahona, supra.* Here, the district court found that the circumstances of the pickup truck with foreign plates on an interstate highway, the defendants' uncertainty about their destination, and Abernathy's observation of the welds on the fuel tank established reasonable suspicion sufficient to entitle the officer to detain the defendants. With respect to the first factor, there clearly is nothing suspicious about the presence of a vehicle with Texas plates on an interstate highway in Iowa. Indeed, while Abernathy testified that, based on his law enforcement training, he was aware of the possibility of drugs being transported in vehicles traveling from the southwest to major cities such as Chicago, he acknowledged that he had discovered drugs in vehicles bearing Iowa license plates as well. As to the second factor, the defendants gave Abernathy consistent statements about their destination. Salvador's lack of knowledge as to the particular vicinage within Chicago that he was going to created no more than an "inchoate and unparticularized suspicion or 'hunch' " that does not rise to the level of reasonable suspicion. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. Finally, the evidence pertaining to the third factor was that Abernathy did not notice the welds on the fuel tank until he began the search of the defendants' truck, at least 10 minutes after he had issued the warning ticket to Servando.

The government contends that the defendants were not detained following the issuance of the warning ticket and that they could have continued their journey. We believe, however, that under all of the surrounding circumstances the defendants could have reasonably believed that they were not then free to leave. See *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *United States v. Drinkard*, 900 F.2d 140, 142 (8th Cir.1990). The driver of the pickup truck, Salvador, was separated from his passenger shortly after the stop and the two remained apart until the search began. Although it was Servando who had committed the traffic offense, very little inquiry was made of him. Instead, Salvador was the primary focus of Abernathy's questioning, virtually all of which took place in the officer's patrol car. As discussed above, the interview of Salvador "incorporated more than a mere request for identification," *Drinkard*, 900 F.2d at 142, but involved repeated interrogation about the defendants' destination. Further, even after the original purpose of the stop had been accomplished, Abernathy did not tell the defendants they could leave. Instead, he had Salvador remain in the patrol car for more questioning.

We reject the government's argument that the defendants' detention following the issuance of the warning ticket was occasioned by Salvador's execution of the Consent to Search form. After the ticket was prepared there was no reason for Salvador to remain in the patrol car other than Abernathy's desire to question him further about his destination and the presence of any drugs or guns in the truck. These events took place after the purpose of the traffic stop was satisfied and before Salvador's signature on the consent form was obtained.

## III. CONCLUSION

Considering as a whole the circumstances given weight by the district court, we conclude that Abernathy lacked a reasonable, articulable suspicion to justify the detention of the defendants following the issuance of the seatbelt warning ticket. *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884. Because the defendants were being illegally detained when Salvador consented to the search of the pickup truck, the consent was tainted by the illegali-

ty and the evidence seized from the truck should have been suppressed. *See Florida v. Royer,* 460 U.S. 491, 508, 103 S.Ct. 1319, 1329–30, 75 L.Ed.2d 229 (1983) (per curiam); *United States v. Millan,* 912 F.2d 1014 (8th Cir.1990). Accordingly, the judgment of the district court is reversed.

BEAM, Circuit Judge, dissenting.

The court's opinion is contrary to existing law in this circuit, or, if not, it heads us down a slippery path toward confusion. Thus, I dissent.

The court properly holds that Trooper Abernathy had probable cause to stop the Ramos pickup truck. The seatbelt of passenger Servando Ramos was not fastened in violation of Iowa Code § 321.445.2. "When an officer observes a traffic offense—however minor—he has probable cause to stop the *driver* of the vehicle." *United States v. Cummins,* 920 F.2d 498, 500 (8th Cir.1990) (emphasis added), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448–49 (1991).

Immediately upon the lawful stop, the court would bifurcate the transaction into both a detention with probable cause and a *"Terry* -stop" based upon some required level of articulable suspicion. *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). Indeed, the court says "[i]n the instant case, after stopping the defendants' truck, Abernathy asked for and received Servando's [the passenger's] driver's license. Although this was all the information he needed to write the seatbelt warning ticket, Abernathy asked for Salvador's [the driver's] license, too." Court's opinion at 351. The court then opines that Salvador had committed no offense and his presence in the patrol car was unnecessary to the conducting of a computer inquiry or writing the seatbelt ticket. The court does not indicate whether a lawful computer inquiry would have involved the passenger, Servando; the driver, Salvador; the vehicle or all three.

After the lawful traffic stop, Abernathy was entitled, at least, to order the driver and the passenger out of the vehicle, to check the identity and validity of the license of the driver (Salvador) and the identity of the pas-

senger (Servando), to run a computer check on the vehicle to establish whether it was stolen or otherwise involved in violations of law and to ascertain whether there were outstanding arrest warrants on either of the Ramos brothers. *See, e.g., Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Shabazz,* 993 F.2d 431, 437 (5th Cir.1993); *United States v. Kelley,* 981 F.2d 1464, 1468–70 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2427, 124 L.Ed.2d 647 (1993); *United States v. Walker,* 933 F.2d 812, 816 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); and *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir.1988). Abernathy, as indicated, properly carried out these procedures within the framework of the lawful traffic stop. And, that is essentially all that occurred up until the driver, Salvador, gave Abernathy written permission to search the vehicle.

It took something less than forty minutes for the traffic stop computer checks to be completed. Salvador, the driver, remained in the patrol car with Abernathy during this period and was questioned about his destination and about his employment. This supplemental inquiry occurred during the lawful seizure occasioned by the traffic stop and was clearly proper under the circumstances. *See Florida v. Bostick,* 501 U.S. 429, —— —— ——, 111 S.Ct. 2382, 2386–87, 115 L.Ed.2d 389 (1991) (mere questioning of passengers on a bus does not constitute a seizure); *Shabazz,* 993 F.2d at 436 (questioning during traffic stop does not constitute a seizure). Abernathy was understandably concerned that the driver of the truck was unsure about his destination.

When the computer checks were completed, Abernathy immediately wrote a warning ticket and delivered it to the passenger, Servando, who had remained in the truck. This ticket was issued at 7:40 A.M. Upon delivery, Abernathy also inquired of the passenger where he was going and asked whether he was carrying drugs or weapons. When Servando stated that he had no contraband, Abernathy immediately returned to the patrol car and asked Salvador about drugs and

weapons. He also asked for and received permission from Salvador to search the truck. The written permission to search was also shown as 7:40 A.M. indicating, at least, that the permission was sought while the events of the traffic stop were still in process or within a minute or so thereafter and thus required no additional delay. There was no "*Terry* -stop." Although the search of the truck occasioned additional delay and intrusion into the Ramos' privacy, the events following the permission to search were consensual. Accordingly, there was no illegal detention giving rise to the suppression of the evidence of drug commerce. The conclusion of the court to the contrary is error.

I dissent.