**UNITED STATES of America, Plaintiff,**

v.

**Oscar Gerardo ALVARADO–
RAMIREZ, Defendant.**

**No. P–96–CR–59.**

United States District Court,
W.D. Texas,
Pecos Division.

Jan. 23, 1997.

G. Glen Roque–Jackson, Asst. U.S. Atty., Midland, TX, for Plaintiff.

Mike Barclay, Alpine, TX, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

FURGESON, District Judge.

Currently pending before the court is Defendant's Motion to Suppress. A hearing on the Motion was held in Pecos on December 15, 1996. Having considered the oral arguments, and the relevant case law, the court finds that the narcotics were seized in violation of Defendant's Fourth Amendment rights and as such cannot be introduced against him at trial.

### I. BACKGROUND

On September 12, 1996, at 2:11 p.m.,[1] Defendant, Oscar Gerardo Alvarado–Ramirez (Ramirez), legally entered[2] the United States from Ojinaga, Mexico at Presidio, Texas. He proceeded north on U.S. Highway 67 to Marfa, which is about 55 miles away. About four miles south of Marfa on Highway 67 is a permanent Border Patrol checkpoint through which individuals must first pass before proceeding. Unlike many checkpoints near the United States/Mexico border in West Texas which are manned around the clock, this particular checkpoint is staffed on an irregular basis. It is only opened when at least two Border Patrol agents are present. At such times, incoming traffic is directed to stop by flashing lights, located some distance up the highway, and orange cones, formed to cause drivers to detour into the checkpoint station. The Marfa checkpoint consists of a trailer with an overhead canopy, a vehicle lift and a small storage building. On the day in question, United States Border Patrol Agent Rodney D. Hall (Agent Hall) was assigned to work the 2 p.m. to 10 p.m. shift conducting traffic operations on Highway 67. He arrived at the Marfa checkpoint, alone, at around 2:45 p.m. At that point, the station had been closed for about six hours. The cones had been removed from the road and traffic proceeded along Highway 67 without being detoured past the checkpoint trailer. Agent Hall parked his Border Patrol vehicle under the canopy facing traffic and observed the oncoming vehicles.

At around 3:05, Defendant's white Chevrolet pickup truck, displaying Chihuahua, Mexico license plates, passed by the checkpoint. As Defendant's truck passed by, Agent Hall noticed that Defendant did not reduce his speed[3] nor make eye contract with the Agent. Agent Hall testified he found that to be doubly suspicious. First, according to the Agent's testimony, most locals who pass through the checkpoint, at the very least, make eye contact and wave to the agent parked beneath the canopy. Second, in Agent Hall's experience, approximately 80–85% of the throughcoming vehicles bearing Mexican license plates stop any time an agent is present at the checkpoint, even if the checkpoint is closed, and the drivers produce documents evidencing the legality of their visit.[4] Since the Defendant did neither, Agent Hall decided to follow him down the highway. The speed of Defendant's vehicle could not have been a factor in the Agent's

---

1. The exact time was determined by the electronic monitoring stations at the Port of Entry.

2. Defendant is a citizen of Mexico and lives in Torreon. At the time of his initial stop, Defendant produced a valid 1–94 card, which was issued to him in El Paso, Texas on July 21, 1996.

3. At the suppression hearing, Agent Hall testified as follows:
 "[He] (Defendant) did appear to be exceeding the speed limit. I don't know for sure. I didn't have a radar gun. but just from observing the vehicles go by, it did appear to be going faster than 70 miles an hour."
 Later in the hearing, the Agent testified that he stopped Defendant to verify his immigration status. INS regulations do not permit Border Patrol agents to stop vehicles for speeding. *See* 8 U.S.C. § 1357. However, the speed at which a vehicle is traveling can be considered one of the factors in the totality of circumstances analysis of whether the driver or the passengers are in this country illegally.

4. Agent Hall also testified that it was common practice for him to follow and stop vehicles bearing Mexican license plates and to check the citizenship status of the occupants if the vehicles did not stop at the checkpoint, even when the checkpoint was closed. The Agent considered this type of stop to be the same as a stop at the checkpoint itself. As the court will soon explain, the two types of stops are not equivalent, and that to pull someone over outside of a checkpoint to check on citizenship status requires at least reasonable suspicion that the driver is in the country illegally or is transporting illegal aliens.

decision. As he began to follow Defendant, Agent Hall radioed the license plate number into Border Patrol Headquarters in an attempt to verify the time of Defendant's border crossing. Having been advised that it would take some time for his request to be processed, Agent Hall signaled for the Defendant to pull over onto the side of the road.

After both vehicles came to a complete stop, Defendant got out of his truck and began to walk toward Agent Hall. The Agent immediately directed Defendant to return to his vehicle, which he did. At the suppression hearing, Defendant testified that it was common practice in Mexico, when stopped, to get out of your car and to walk to the police car. When Agent Hall approached Defendant's vehicle, Defendant offered to shake hands. The Agent thought that Defendant's offer was out of the ordinary. Having found all of Defendant's papers in order, Agent Hall testified that he then asked Defendant for permission to search the vehicle. Defendant denies that he was ever asked for, or gave, permission for the search. Whatever may have been the case, Agent Hall proceeded with his inspection. He inspected the dashboard and the glove compartment, and then proceeded to the exterior. The Agent noticed that the truck was freshly painted. He testified that this was a common indicator of a concealed narcotics load. A propane tank was mounted in the bed of the truck. The Agent tapped the tank and did not hear anything suspicious. A gas tank, called a saddle tank, was mounted beneath the vehicle on the passenger side. As the Agent crouched down for a better look, he noticed a new screw and clamp on the filler hose going to the tank. The Agent then tapped the gas tank and heard a dull sound. To him, this was an indication that something solid might be concealed inside. At this point, Agent Hall asked the Defendant to follow him to the Border Patrol headquarters at Marfa, about four miles away, so that a drug sniffing dog could be called in to inspect the vehicle. Defendant agreed to do so.

When the two arrived in Marfa, Agent Hall was advised that the closest dog was in Alpine and could be brought to Marfa in about 25 minutes. Defendant agreed to wait.

While everyone waited for the dog to arrive, Supervisory Agent Mark Kemp went out, tapped the saddle tank, and also heard a sound as if something solid was in the tank. The dog finally arrived and was allowed to go over the vehicle. The dog gave no alert and therefore did not indicate that there was any trace of narcotics in the truck. Rather than let Defendant proceed with his business or try to obtain a warrant for a more thorough search, Agent Hall asked Defendant if he would follow the Agent back to the checkpoint outside of Marfa, so that the pick-up could be raised on a lift and more thoroughly inspected. At no point during this entire time was the Defendant placed under arrest or read his *Miranda* rights. Defendant agreed to follow Agent Hall back to the checkpoint. Once the Defendant arrived at the checkpoint, he was placed in a holding cell while his truck was examined. Agent Hall testified that the Defendant was placed in a holding cell for his safety and the safety of the two agents inspecting the truck. The agents could not both inspect the truck and keep an eve on Defendant at the same time. There is conflicting testimony as to whether Defendant was actually locked in the holding cell. Defendant testified that he was. Agent Hall, the other hand, testified that he simply closed the door to the holding cell and left the keys in the door. Even then, he was not charged with anything nor read his rights. A further inspection of the vehicle showed that the bolts holding the tank in place were either missing or lose, The drug sniffing dog was again called to the vehicle. This time, the dog alerted to the saddle gas tank. A search of the tank then revealed 60.16 pounds of marijuana were secreted. Only then was Defendant formally arrested and charged with possession with intent to distribute and possession of marijuana in violation of 21 U.S.C. § 841(a)(1). Before outlining the arguments of the parties, it should be noted that both Agent Hall and the Defendant were courteous toward each other at all times. There is no indication at all that Agent Hall was ever threatening in any way toward the Defendant or that the Defendant was ever difficult in his dealings with Federal law enforcement officers. Both men acted

with propriety and appropriateness in their personal dealings with one other.

Defendant argues that evidence of the marijuana should be suppressed because it was illegally obtained, in violation of Defendant's Fourth Amendment *rights*. The government has come back with a five-pronged response. First, it argues that the search was lawful because it was the result of a free and voluntary consent. Second, the search was lawful because it was supported by probable cause. Third, the search should be upheld because it was supported by reasonable suspicion. Fourth, the search should be upheld because it occurred at the "functional equivalent" of the border. Finally, evidence of the seized narcotics should be admitted under the "good faith" exception to the exclusionary rule. The court will address each of these points below, but not necessarily in that order.

## II. FOURTH AMENDMENT ANALYSIS

### A. STANDARD FOURTH AMENDMENT LAW AS IT APPLIES TO VEHICLE STOPS

■ The Fourth Amendment to the United States Constitution provides in pertinent part that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause. . . .

The Fourth Amendment bars only *unreasonable* searches and seizures. *See United States v. Pierre*, 958 F.2d 1304, 1308 (5th Cir.1992); *United States v. Brignoni–Ponce*, 422 U.S. 873, 877, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607, 614 (1975) (holding that the Fourth Amendment applies to seizures that involve only a brief detention short of traditional arrest); *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). The reasonableness inquiry is driven by a balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Pierre*, 958 F.2d at 1308–09 (cit-

ing *New York v. Class*, 475 U.S. 106, 118, 106 S.Ct. 960, 968, 89 L.Ed.2d 81 (1986)); *see also Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1983). However, the intrusiveness of the search is not measured so much by its scope as by whether it invades an expectation of privacy that society is prepared to recognize as "reasonable." *Pierre*, 958 F.2d at 1309 (citing *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)). The exclusionary rule, as it has developed under the Fourth Amendment, provides that evidence obtained in violation of an individual's Fourth Amendment rights may not be introduced against him at trial. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963). For the most part, courts look askance at any searches conducted without a warrant. The Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions. *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir.1993) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971)). The exceptions include searches on the basis of probable cause or consent.

■ There is no question but that the stopping of an automobile by a police officer is a seizure within the meaning of the Fourth and Fourteenth Amendments. *Brower v. County of Inyo*, 489 U.S. 593, 596–97, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989): *Delaware v. Prouse*, 440 U.S. 648, 653, 661, 99 S.Ct. 1391, 1396, 1400, 59 L.Ed.2d 660 (1979); *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir.1993); *United States v. Thomas*, 787 F.Supp. 663, 669 (E.D.Tex. 1992). A vehicle may lawfully be stopped (with one major exception, pertinent only in the border area, to be noted below) by a law enforcement officer only when there is probable cause to stop the vehicle or, lacking probable cause, when the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot." *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1, 10 (1989); *United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45

L.Ed.2d 607 (1975); *United States v. Breeland*, 53 F.3d 100, 102 (5th Cir.1995); *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889). The latter type of stop is often referred to as an investigative or *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Cooper*, 43 F.3d 140, 145 (5th Cir.1995). According to *Terry*, even in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity, *United States v. Tapia*, 912 F.2d 1367, 1370 (11 th Cir.1990). Such criminal activity includes traffic violations, however minor. *See Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam) (stop for expired license plate); *United States v. Kelley*, 981 F.2d 1464 (5th Cir.1993) (stop for seatbelt violation); *Breeland* 53 F.3d at 102; *Thomas*, 12 F.3d at 1366; *United States v. Shabazz*, 993 F.2d 431, 434–35 (5th Cir.1993); *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir.1994).

■ Probable cause means "a fair probability that contraband or evidence of a crime will be found," *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585, 104 L.Ed.2d at 10; *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 541, 544, 105 S.Ct. 3304, 3310–11, 3312, 87 L.Ed.2d 381 (1985). If the officer is legally authorized to stop the driver, his actual intent or motivation does not invalidate the stop. *Bloomfield*, 40 F.3d at 915. Although *Terry* involved the seizure of an individual, its rationale has been extended and consistently applied to vehicle stops. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *United States v. Hensley*, 469 U.S. 221, 226, 105 S.Ct. 675, 678, 83 L.Ed.2d 604 (1985); *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir.1993); *United States v. Kelley*, 981 F.2d 1464 (5th Cir.1993). Under *Terry*, the judicial inquiry into the reasonableness of the search or seizure "is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Shabazz*, 993 F.2d at 435 (citing *Terry*, 392 U.S. at 19, 88 S.Ct. at 1879).

■ Last session, in the case of *Whren v. United States*, —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court held that the actual motivations of the individual officer involved in making the stop did not matter, *id.* at ——, 116 S.Ct. at 1774–75, 135 L.Ed.2d at 98, so long as the officer had probable cause to believe that the driver had violated the traffic code. *Id.* at ——, 116 S.Ct. at 1776, 135 L.Ed.2d at 101. The Court also rejected defendants' contention that a "reasonable officer" standard should be applied to determine whether the stop for that type of traffic violation would have occurred under normal circumstances, or was nothing more than a pretext. In *Whren*, the car that was pulled over had made a sharp turn without signaling and had taken off at an "unreasonable" speed. *Id.* at ——, 116 S.Ct. at 1772, 135 L.Ed.2d at 95. There was at least a clear traffic violation, turning without a signal, which gave the officers cause to pull the vehicle over. Although a Border Patrol Agent is not legally permitted to stop a vehicle for a speeding violation, whether or not an individual is speeding, as the court notes below, can be one factor to consider as to whether there is a reasonable suspicion that the car's driver or its passengers are in the country illegally.

A stop of a vehicle when there is no probable cause to justify it can normally occur in one instance, and one instance only (outside of the border context): when there are articulable facts which give rise to a "reasonable suspicion" that the suspect has engaged in, or is about to engage in, criminal activity. The following, quoted from *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir.1990), is the standard definition of "reasonable suspicion:"

According to *Terry*, even in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity.

(citations omitted) In justifying such an intrusion, the "reasonableness" standard requires that a police officer "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879 (footnote omitted). In this regard, "reasonable suspicion" is determined from the totality of the circumstances, *United States v. Sokolow*, 490 U.S. 1 [5–8] 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), and from the collective knowledge of the officers involved in the stop. *United States v. Williams*, 876 F.2d 1521, 1524 (11 th Cir.1989); *United States v. Cotton*, 721 F.2d 350, 352 (11 th Cir. 1983), *cert. denied*, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). Such a level of suspicion is obviously considerably less than proof of wrongdoing by a preponderance of the evidence, *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984), or even the implicit requirement of probable cause that a fair probability that evidence of a crime will be found. *Sokolow*, 490 U.S. at 6–8, 109 S.Ct. at 1585. Nevertheless, "reasonable suspicion" must be more than an inchoate "hunch," and the Fourth Amendment accordingly requires that police articulate some minimal, objective justification for an investigatory stop. *Id.; Williams*, 876 F.2d at 1524.

In *Sokolow*, the Supreme Court reiterated which factors not in themselves proof of illicit conduct and/or quite consistent with innocent travel can, when taken together, give rise to a reasonable suspicion of criminal or drug activity. *Sokolow*, 490 U.S. at 10, 109 S.Ct. at 1587–88, 104 L.Ed.2d at 12. As early as 1983, in the case of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, the Supreme Court noted that "innocent behavior will frequently provide the basis for a showing of probable cause," and that "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Gates*, 462 U.S. at 243–44 n. 13, 103 S.Ct. at 2335 n. 13. In *Sokolow*, the Supreme Court applied this same principle to the reasonable suspicion inquiry. *Sokolow*, 490 U.S. at 10, 109 S.Ct. at 1587, 104 L.Ed.2d at 12.

■ Applying this analysis to the case at hand, the court finds that Agent Hall had neither probable cause nor reasonable suspicion to stop Ramirez. In the first place, it is reiterated that Agent Hall did not have the authority, under INS regulations. to stop vehicles for speeding. *See* 8 U.S.C. § 1357. Hence, his mere surmise that Ramirez appeared to be speeding cannot furnish a basis. in and of itself, to effect this stop. The court also observes that Agent Hall did not evidence any confidence in his own opinion that Ramirez appeared to be speeding. Although the court found Agent Hall to be a very credible witness, on this point about speeding, the court finds there is insufficient evidence to support the fact of speeding. even as to Agent Hall's subjective opinion.

Agent Hall also testified that, as Ramirez passed him, he failed to acknowledge Agent Hall's presence by either making eye contact, slowing down or *waving*. Ramirez had no legal obligation, however, to do any of these things as he drove along a U.S. highway. Finally, Agent Hall found suspicious the fact that Ramirez did not pull over and show Agent Hall his papers, although *again* Ramirez had no legal obligation to do so. The checkpoint was closed. In all respects, the conduct of Ramirez as he passed Agent Hall was proper and legal; a non-resident with appropriate papers allowing entry into the United States is not required under normal circumstances to stop and present those papers to a Border Patrol agent on a U.S. highway and is not required under normal circumstances to acknowledge the presence of any agent the non-resident passes on the highway. Perfectly legal conduct cannot be the basis for probable cause or for a reasonable suspicion. Otherwise, traffic stops could be justified when a person fully stops at a stop sign on the basis that, because no one fully stops, it is suspicious when someone does. Likewise, the totality of the circumstances in a situation like this, adding up again to legal conduct, cannot be the basis even for reasonable suspicion. Therefore, under standard Fourth Amendment analysis,

no basis existed for Agent Hall to stop Ramirez.

The inquiry does not end here, however, because where borders are concerned, a somewhat different set of rules applies. As will be detailed below, stops of vehicles at border checkpoints or their functional equivalents do not require either probable cause or reasonable suspicion, but are a matter of right. However, stops outside of these points, no matter how close in proximity to the actual checkpoint, once again become subject to constitutional vagaries previously discussed. The court will address three issues below: the border search doctrine, the extended border search doctrine, and statutory authority for making stops. A more thorough discussion of "reasonable suspicion" takes place in the latter two sections.

## B. BORDER SEARCHES

### 1. Searches at Border Checkpoints vs. Searches at Interior Checkpoints

■ The additional exception to warrantless searches is the border search doctrine. *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir.1993). Under this doctrine, a governmental officer at the international border may conduct routine stops and searches without a warrant or probable cause because the United States as a sovereign state has the right to control what persons or property crosses its international borders. *Id.* (citations omitted) The border search doctrine is also applicable to stops and searches conducted at the "functional equivalent" of the border, i.e., the first point at which an entrant may practically be detained. *Id.* (citing *Almeida–Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596(1973)). In *Almeida–Sanchez, the Supreme Court gave very* little guidance as to what constitutes the "functional equivalent" of the border. It did, however, give two examples:

> [S]earches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis

airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

*Almeida-Sanchez*, 413 U.S. at 272–73, 93 S.Ct. at 2539. Within Fifth Circuit jurisprudence, prior to 1987, internal checkpoints, like the one at hand, were considered to be "functional equivalents" of the border. This meant that border patrol agents manning those checkpoints could conduct the same types of searches as could border patrol agents at the actual border. In other words, agents exercised the power to choose which cars to search, without having to articulate any reason for their actions. *See United States v. Jackson*, 825 F.2d 853, 861 (5th Cir.1987) (en banc). Any vehicle or person could be stopped for any reason, or no reason at all. *Id.* In *Jackson*, the Fifth Circuit reversed many years of precedent and held that the Fourth Amendment vitiated against such unbridled discretion at internal checkpoints. More specifically, the Fifth Circuit held that the permanent checkpoint at Sierra Blanca, which is situated about 20 land miles and 14 air miles from the United States–Mexico border, was not the "functional equivalent" of a border checkpoint. Accordingly, searches for any reason were no longer permissible.

The Fifth Circuit came to a realization that it had erred in constitutionally equating searches at border checkpoints and searches at interior checkpoints. *Jackson*, 825 F.2d at 858. The constitutional analysis, in fact, was fundamentally different. While the constitutionality of searches conducted at the border, or a border equivalent, did not depend on a Fourth Amendment analysis, *id.* at 857; *see also Almeida–Sanchez*, 413 U.S. at 272, 93 S.Ct. at 2539; *Carroll v. United States*, 267 U.S. 132, 150, 45 S.Ct. 280, 284, 69 L.Ed. 543 (1925) ("border searches are not 'embraced within the prohibition of the [Fourth] [A]mendment.'"), searches at internal checkpoints did. In *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1979, 52 L.Ed.2d 617 (1977), Justice Renquist, writing for the Court, explained the special analysis for border searches as follows:

> Border searches, then, from before the adoption of the Fourth Amendment, have

been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself.

431 U.S. at 619, 97 S.Ct. at 1980. The unique factor that is present at a border crossing is that an individual is coming into this country from abroad. Whether that individual is an American citizen or a foreign national, he or she is subject to the same type of search, without even having aroused any type of suspicion to merit the search. The Fifth Circuit recognized that "it is the *single fact* that the individual or item has entered this nation from outside that justifies the search." *Jackson,* 825 F.2d at 858. The Court went on to say that in order for an internal checkpoint to be considered a "functional equivalent" of the border, the conditions at the two must be substantially similar. In other words, to justify searches at checkpoints labeled the "functional equivalent" of the border the government must demonstrate with 'reasonable certainty' that the traffic passing through the checkpoint is "international" in character. *Id.* at 860. In practical terms, this test means that border equivalent checkpoints intercept no more than a negligible number of domestic travelers. *Id.*

█ In this case, however, the government has failed to introduce any evidence showing that the traffic passing through the Marfa checkpoint is primarily international in character. Nor does the court think that such evidence exists. Indeed, Agent Hall testified that Highway 67 south of Marfa is well-traveled by local residents in the area. The government's allegation, therefore, that the

Marfa checkpoint is the "functional equivalent" of the border is not enough. Having received no evidence to the contrary, the court finds that the Marfa checkpoint is not the "functional equivalent" of the border.[5]

## 2. The Extended Border Search Doctrine

█ A routine search at the border or its functional equivalent may be made without probable cause or any suspicion to justify the search. *United States v. Cardenas,* 9 F.3d 1139, 1148 (5th Cir.1993) (citing *United States v. Sandler,* 644 F.2d 1163, 1167–69 (5th Cir.1981) (en banc)). This same type of search may also take place outside the border or its functional equivalent if certain conditions are met. The border search doctrine has been extended to allow government officials to conduct a warrantless search and seizure *beyond* the border or its functional equivalent on the "reasonable suspicion" of criminal activity. *Cardenas,* 9 F.3d at 1148 (emphasis in original); *see also Espinoza–Seanez,* 862 F.2d at 531; *United States v. Melendez–Gonzalez,* 727 F.2d 407, 410–11 (5th Cir.1984). "The main difference between the functional equivalent of the border search and an extended border search is that the latter takes place *after* the first point in time when the entity might have been stopped within the country." *Cardenas,* 9 F.3d at 1148 (quoting *United States v. Niver,* 689 F.2d 520, 526 (5th Cir.1982)). The *Cardenas* court summarized the extended border search doctrine as follows:

> An extended border search entails a greater intrusion on an entrant's legitimate expectations of privacy than does a search conducted at the border or its functional equivalent. Accordingly, this court has determined that three factors must be demonstrated before an extended border search is deemed reasonable and hence constitutionally permissible: (1) a showing of a 'reasonable certainty' or a 'high de-

---

5. What does this mean in regard to the types of searches that may be conducted at this checkpoint? First, it means that Border Patrol agents cannot indiscriminately search all vehicles passing through t he checkpoint when it is open. Rather, the border patrol agents manning these internal posts can now stop and query motorists about their citizenship, and request the produc-

tion of documents evidencing a right to be in the United States. *Jackson,* 825 F.2d at 862. However, any further detention, including the search of the vehicle. has to be based on probable cause or consent. *Id.* (citing *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)).

gree of probability' that a border crossing has occurred; (2) a showing of a 'reasonable certainty' that no change in the condition of the person or vehicle being inspected occurred from the time of the border crossing until the search and that the contraband found was present when the person or vehicle crossed the border; and (3) a showing of a "reasonable suspicion" that criminal activity was occurring. This court has also determined that "reasonable certainty" is "a standard which requires more than probable cause, but less than proof beyond a reasonable doubt." Further, in determining whether there is a "reasonable suspicion" that criminal activity was occurring, each case "must turn on the totality of the particular circumstances."
*Id.* at 1148 (internal citations omitted).

 Again, in this case, even if the government could establish the first two elements (the court will assume that it can for purposes of this case), the government has not articulated facts which would give rise to a "reasonable suspicion" that something criminal was afoot. Having lawfully entered the United States, Defendant was traveling on a United States highway, apparently within the speed limit, breaking no traffic or other laws, when he passed Agent Hall. The reasons articulated by Agent Hall for stopping the Defendant were that Defendant "appeared" to be speeding, that Defendant did not acknowledge the Agent as he passed by, and that Defendant did not stop his vehicle and produce a permisso, as do about 80–85% of the vehicles bearing Mexican license plates. Although the court has already addressed earlier the reasonable suspicion standard and will do so in more detail below, in the context of roving border patrol stops, all of the facts articulated by Agent Hall, even if found to be true, do not give rise to a reasonable suspicion that something criminal was afoot or that Defendant was in the country illegally. Certainly, when taken together, activities which, individually, may look completely innocent to an innocuous eye, may cause alarm to a trained professional. However, the Agent himself testified that it was his standard practice to stop all vehicles bearing Mexican license plates, even when the checkpoint was closed. to verify the driv-

ers' citizenship status. This testimony leads the court to conclude that unless Defendant had stopped and produced his permisso, he would have been pulled over by Agent Hall regardless of whether the Agent thought he was speeding or not. Because the government has failed to articulate facts which would give rise to a reasonable suspicion that something illegal was afoot, the court finds that the extended border search doctrine does not apply. The court will revisit the issue of reasonable suspicion shortly.

**3. Statutory Powers to Search Within a Reasonable Distance of the Border (8 U.S.C. § 1357)**

The government argues that Border Patrol agents, by statute. are permitted to stop motorists within a reasonable distance of the border to check their status for being in the United States. On its face, 8 U.S.C. § 1357, does seem to give officers of the INS, including Border Patrol agents, complete discretion to stop vehicles without a warrant or probable cause within a reasonable distance of the border. Section 1357, reads, in part, as follows:

(a) Powers without warrant

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

. . . . .

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;

Federal regulations, 8 C.F.R. § 287.1(a)(2), interpret the term "reasonable distance" to mean a distance "within 100 air miles from any external boundary of the United States...."

In *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Supreme Court considered a question similar to the one currently before this court: may Border Patrol agents stop vehicles to check the citizenship status of the occupants? The facts in *Brignoni–Ponce* are almost identical to the ones here. Two Border Patrol agents were parked at an internal checkpoint, 5 miles south of San Clemente, California, observing passing traffic. The checkpoint had been closed due to inclement weather. It was nighttime, so the officers had their headlights directed at the oncoming vehicles. At some point they observed Brignoni–Ponce, a Mexican national who possessed a United States work permit, drive through. With him were two other individuals of Mexican descent. The agents decided to pull Brignoni–Ponce over to check his, and his passengers', citizenship status. As it turned out, both passengers were in the country illegally, and Brignoni–Ponce was charged with transporting illegal immigrants. At trial, he sought to suppress the testimony of and about the two passengers, claiming that this evidence was the fruit of an illegal seizure. *Id.* at 875, 95 S.Ct. at 2577, 45 L.Ed.2d at 613. The government contended that the above-quoted statutory provisions gave the agents the right to stop the defendant and question him and his passengers regarding their right to be in the United States. The government further claimed that at least in the areas adjacent to the Mexican border, a person's apparent Mexican ancestry alone justified belief that he or she was an alien and satisfied the requirements of 8 U.S.C. § 1357(a)(3).

 The Supreme Court disagreed with both propositions. First, the Court reaffirmed its earlier decision in *Almeida–Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596, (1973), which disapproved of roving patrols. Prior to that decision, Border Patrol agents could stop vehicles at will, at areas near the border other than at checkpoints, and search them for contraband or illegal aliens. The Court held that "in the absence of probable cause or consent, [such] searches violate .... [the] Fourth Amendment right to be free of 'unreasonable searches and seizures.'" *Id.* at 273, 93 S.Ct. at 2540, 37 L.Ed.2d at 603. In *Brignoni–Ponce*, the Court held that "to approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers." *Id.* at 882, 95 S.Ct. at 2580–81, 45 L.Ed.2d at 617. As noted earlier, *Almeida* introduced the concept of the "functional equivalent" of the border, at which the same type of search could be conducted as was permissible at the actual border. After *Almeida*, then, indiscriminate searches by roving patrols were no longer permitted. The second thing the Court did in *Brignoni–Ponce* was weigh the interest of the government to protect the country's borders from the influx of illegal immigrants versus the interest of individuals to be free from undue government intrusion. What the court came up with was the exact same standard used to justify an investigatory stop when probable cause is missing. After weighing the two competing interests, the Court noted that

> ... because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in *Terry*, the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' (citation omitted). The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.

*Id.* at 881–82, 95 S.Ct. at 2580–81, 45 L.Ed.2d at 617. A requirement of reasonable suspicion for stops allows the government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference. *Id.* at 883, 95 S.Ct. at 2581, 45 L.Ed.2d at 617. The effect of the Court's decision was to limit exercise of the authority granted by both §§ 1357(a)(1) and (a)(3). Except at the border and its functional equivalents, officers on roving patrols may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country. *Id.* at 884, 95 S.Ct. at 2581–82, 45 L.Ed.2d at 618. The Court also shed some light on what may give rise to such a reasonable suspicion.

> Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area. Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant. (citations omitted) They also may consider information about recent illegal border crossings in the area. The driver's behavior may be relevant. as erratic driving or obvious attempts to evade officers can support a reasonable suspicion. (citations omitted) Aspects of the vehicle itself may justify suspicion.... The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide.... In all situations, the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling. (citing *Terry*).

*Id.* at 884, 95 S.Ct. at 2581–82, 45 L.Ed.2d at 618–19. Addressing the point of whether the fact that the driver and the occupants of the vehicle appeared to be of Mexican ancestry was by itself enough to justify the stop, the Supreme Court held that

> this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country.... The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican–Americans to ask if they are aliens.

*Id.* at 886–87, 95 S.Ct. at 2582–83, 45 L.Ed.2d at 619–20.

■■■ This rationale is applicable to the case at hand. The fact that Defendant, an individual of Mexican descent, also happened to. be driving a vehicle bearing Mexican license plates, without more, is not reason enough to justify stopping him to see whether he is in the country legally. *See, e.g., United States v. Soto–Soto,* 598 F.2d 545, 547 (9th Cir.1979). The stop occurred some 50 miles north of the border. The government did not put forth any evidence as to whether U.S. Highway 67 was regularly used to transport illegal aliens. Nor did the government put forth any profiling evidence as to the characteristics of individuals who fit the category of an illegal alien or those who transport illegal aliens, or as to the type of vehicle or vehicles usually used. Clearly, the fact that Defendant did not stop at a closed checkpoint and did not look and waive at Agent Hall does not justify his "seizure" to check immigration status, without probable cause, or at the very least "reasonable suspicion." It is important to keep in mind that this analysis applies only to roving patrols. As was earlier discussed, a completely different set of rules governs searches at the border or at functional equivalents of the border. Stops at internal checkpoints not the "functional equivalent" of the border are likewise governed by a different set of rules. There, while a complete search of the vehicle is not permitted absent probable cause or consent, Border Patrol agents manning open checkpoints are permitted to ask all passers-through their citizenship and require every individual to produce documentation evidencing their right to be in the United States. The agents are given complete discretion as to who to pose these questions to and from whom to request documentation.

■ Where a stop occurs outside of even these checkpoints, Border Patrol agents are governed by the same restraints as are other law enforcement officers. In other words, if agents would like to pull someone over to check their citizenship status, they must be able to articulate a legitimate reason for their suspicion that either the driver is an illegal alien or is transporting an illegal alien. This threshold is lower than what is needed to establish probable cause, but is nevertheless more than a hunch, and more than that the person is of Mexican, or non-white, descent. In addition, the fact that Defendant was driving a vehicle bearing Mexican license plates is a factor to consider in deciding whether a reasonable suspicion exists to make the stop, but in and of itself is not enough to justify it. Thus, the court's first determination is that Defendant was illegally stopped. This does not mean, however, that evidence of the narcotics need necessarily be suppressed. That depends on whether or not Defendant voluntarily consented to a search of his vehicle and whether or not the search exceeded the scope of his consent.

### III. CONSENT TO SEARCH

■ Simply because the initial stop of Defendant was illegal does not mean that the evidence seized must necessarily be suppressed. If the Defendant voluntarily consented to the search, even if the consent was given during a period of illegal detention, the search becomes validated and the evidence seized need not be suppressed. *See Shabazz,* 993 F.2d at 439 n. 10. To be valid, consent to search must be free and voluntary. *United States v. Kelley,* 981 F.2d 1464, 1471 (5th Cir.1993) (quoting *United States v. Olivier–Becerril,* 861 F.2d 424, 425 (5th Cir.1988)). Where the initial stop is proper, the government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary. *Kelley,* 981 F.2d at 1470; *United States v. Yeagin,* 927 F.2d 798, 800 (5th Cir.1991). However, where consent is preceded by a Fourth Amendment violation, the government has a heavier burden of proving consent. *Kelley,* 981 F.2d at 1470; *United States v. Ruigomez,* 702 F.2d 61, 65 (5th Cir.1983). The voluntariness of consent is a "question of fact to be determined from the totality of the circumstances." *Kelley,* 981 F.2d at 1470 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973)).

In *United States v. Olivier–Becerril,* 861 F.2d 424 (5th Cir.1988), the Fifth Circuit reviewed six factors in determining whether consent to search was voluntary: (1) the voluntariness of the Defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the Defendant's cooperation with the police; (4) the Defendant's awareness of his right to refuse to consent; (5) the Defendant's education and intelligence; and (6) the Defendant's belief that no incriminating evidence will be found. Id. at 426. Although all of the factors are relevant, none is dispositive or controlling of the voluntariness issue. *Id.* As was previously noted, when the government tries to establish that there was a voluntary consent after an illegal stop, the government has a much heavier burden to carry than when the consent is given after a permissible stop. *United States v. Ruigomez,* 702 F.2d 61, 65 (5th Cir.1983); *United States v. Ballard,* 573 F.2d 913, 916 (5th Cir.1978); *United States v. Jones,* 475 F.2d 723 (5th Cir.1973).

■ During the suppression hearing, the court received two diametrically opposed testimonies. Agent Hall testified that Defendant consented to the initial search. Defendant testified that he did not. Agent Hall spoke Spanish to Defendant, who testified that the Agent spoke the language without much difficulty. There was no testimony to the effect that Defendant was asked to sign a Consent to Search form. While it is up to the court to resolve these differences in testimony, even if the court were to find Agent Hall's testimony more credible, the government still has failed to carry its heightened burden of proving that Defendant voluntarily consented to the search. In *Ballard,* the Fifth Circuit gave examples of the kind of evidence the government must put forth in order to validate a search after an illegal stop. It is worth quoting a portion of that opinion:

In *Bretti v. Wainwright,* 439 F.2d 1042 (1971), this court upheld a search following an illegal arrest. The court based its holding on two factors, the absence of any coercive tactics and, more importantly, the presence of significant intervening factors. The most significant factor relied upon by the court was a warning informing defendant of his right to refuse to permit the search in addition to the standard elements of the *Miranda* warning. The court reasoned:

> While warnings prior to a consensual search may not have the same indispensability as those required prior to a confession ... they do help insure that the consent is free, voluntary, and untainted by the arrest's possible illegality. In the instant case, the presence of these warnings leads us to conclude that any coercion flowing from the possible illegality of appellant's arrest was dissipated.

Similarly in *United States v. Fike,* 449 F.2d 191 (5th Cir.1971), this court held that advising a defendant of his right to refuse to permit a search was a sufficient intervening occurrence to remove the influence of a prior Fourth Amendment violation.

*Id.* at 916. In this case, the government did not offer any evidence that Defendant was first warned he could refuse to permit a search prior to the request being made. The government offered no evidence of any intervening factors which would have "legalized" the search in light of the initial Fourth Amendment violation. As such, the court finds that if consent was in fact given by Defendant, it was given involuntarily. Accordingly, any evidence seized from Defendant's truck was seized in violation of Defendant's Fourth Amendment rights and may not be used against him at trial.

## IV. GOOD FAITH EXCEPTION TO THE EXCLUSIONARY RULE

Lastly, the government argues that the seized narcotics should be admitted under the good faith exception to the exclusionary rule, pointing to *United States v. De Leon–Reyna,* 930 F.2d 396 (5th Cir.1991) (en banc). In *De Leon–Reyna,* the Fifth Circuit found, generally, that the good faith exception applies to cases in which a police officer errs, but nevertheless maintains a good faith and objectively reasonable belief that he has an adequate foundation to make a stop. *Id.* at 400–01. Specifically, the Fifth Circuit found that the exception applied to the facts before it. A border patrol agent was parked on a deserted road known as an alternative route for smuggling drugs and illegal aliens. During his surveillance, he noticed a welding truck heading in his direction. *Id.* at 397. He was immediately struck by the truck's want of welding equipment—there were no tanks, arc welders, or metal hoses present in the trucks, unlike trucks the agent had previously inspected in the area. *Id.* at 397–98. Instead, the truck was heavily laden with plywood. The agent radioed in the truck's license plate number "WM–1438." The dispatcher, however, misunderstood him to say "WN–1438," and radioed back that the license plate belonged to a vehicle other than the one the agent was following. Based on that information, and his observations. the agent pulled the vehicle over. A title check, however, revealed that the title matched the license plate on the back. Nevertheless, the agent obtained consent to search the truck, and subsequently discovered a half-a ton of cocaine. The *De Leon–Reyna* court held that the key to determining whether the exception applies is whether or not the officer's actions in first stopping the vehicle are objectively reasonable. *Id.* at 399, That, in turn, depends on the totality of the circumstances known to the officer at the time of the stop. *Id.* at 399 (citing *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). The question answered in the affirmative by the Fifth Circuit in *De Leon–Reyna* was whether the agent's good faith reliance on the license plate report, along with other circumstances, in determining to stop the defendant's truck, was objectively reasonable.

■ In the instant case, none of Agent Hall's actions were objectively reasonable, either standing alone or taken together. The Agent could not reasonably have believed that a random stop was permissible solely on the basis that Defendant's vehicle bore Mexican license plates. Ever since *Almeida,* it

has been clear that roving patrols may not indiscriminately stop vehicles to check the occupant's citizenship status. Furthermore, it certainly is not objectively reasonable to pull someone over simply because they don't smile and waive to an agent. To permit that to be the basis for a stop would be to do away with all Fourth Amendment safeguards currently in place. Finally, the fact that a noncitizen fails to stop at a checkpoint when a stop is not required cannot be a basis to effect a later stop. Even the totality of these circumstances cannot justify a stop in such a situation. Because Agent Hall's actions were not objectively reasonable, and because the Agent could not been have reasonably mistaken that his actions were authorized, the court finds that the good faith exception to the exclusionary rule does not apply in this case. Because the court's analysis comes to an end, the court will not have an opportunity to address several of the other Fourth Amendment issues presented in this case: 1) whether the request by Agent Hall for Defendant to accompany him back to the checkpoint after the drug sniffing dog failed to alert the agents to the presence of narcotics constituted a *de facto* arrest; and 2) whether the placing of Defendant in a holding cell while his car was being searched without charging him or reading him his rights constituted an arrest. The resolution of these issues such as these will have to await another day. .

As a final note, the court must observe that Fourth Amendment issues are difficult and intricate for courts to resolve, as this opinion indicates. If the courts struggle, even after spending weeks analyzing fact situations and researching the law, it is clear that the struggles of law enforcement are even greater, since they are on the front lines trying to make instantaneous judgments, often under ambiguous circumstances. By and large, most law enforcement officers do a remarkable job carrying out their work and obeying the Fourth Amendment. Agent Hall certainly seems to be worthy of inclusion into this group. Indeed, the court was impressed with him and with his good intentions. He acted courteously toward Ramirez at all times and exhibited a conscientiousness toward his duties that is praiseworthy. Al-

though this court believes that he made a mistake in this case and that he should re-examine some procedures he follows as standard approaches to stopping non-residents, nothing in this opinion should be read as a judgment that he is seeking to circumvent the Fourth Amendment as he performs his responsibilities. There is no evidence of such dereliction at all.

Agent Hall did his duty to the best of his ability. He was vindicated in his belief that Ramirez was carrying illegal drugs. There are occasions, though, that a seizure cannot be allowed to stand because of the dictates of the Fourth Amendment. This is one of those very limited occasions. As difficult as Fourth Amendment law is to decipher and enforce, the court is confident that Agent Hall will make the right decision next time. At the very least, it is clear he will try very hard to do so. That is all anyone can ask for, from either law enforcement or the judiciary. There is no perfection, simply a striving for something close to perfection. Accordingly,

It is ORDERED that Defendant's Motion to Suppress be GRANTED.